UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JEFF BONOMO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Cause No. 4:21-cv-00411-SEP |
| ) | |
| THE BOEING COMPANY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

Before the Court is Boeing's Motion for Summary Judgment. Doc. [10]. For the reasons stated below, the Court will grant the Motion.

### FACTUAL BACKGROUND

This case arises from the same circumstances as *Bonomo v. The Boeing Co.*, No. 19-cv-03394-SEP (*Bonomo I*) (E.D. Mo. filed Dec. 30, 2019). The Court incorporates the facts recited in its Order granting summary judgment in that matter. *See Bonomo I*, Doc. 52. Additional relevant facts are as follows.

After Daniel Oetjen was selected for the Level M Flight Ramp manager position on December 4, 2018, he became Bonomo's supervisor. Docs. [22] ¶ 76, [27] ¶ 37. While Bonomo thought this was an "awkward situation," because he had taught Oetjen only months before about how to be a ramp supervisor, Bonomo testified that he "never let anything interfere with doing [his] job." Doc. [22] ¶¶ 77, 78. Bonomo testified that he was disgruntled on account of the perceived discrimination against him, but that he was unsure whether anyone at Boeing was trying to force him out of the company. Docs. [22] ¶ 79, [12-1] at 198:2-14. Bonomo eventually decided to depart from Boeing and on November 25, 2019, he sent Oetjen an email stating:

> I've terminated my employment with Boeing as of 01/02/2020. You should receive paperwork that you will need to fill out. Can you please let me know when you receive the termination paperwork. [sic].

Doc. [22] ¶ 81. Bonomo reported for work the last time on November 22, 2019, and used his remaining leave days until January 2, 2020. *Id.* ¶¶ 83, 85, 86. Before he left, Bonomo was given a retirement party, where he ate cake, drank coffee, and received gifts from his co-workers. Docs. [22]

1

¶ 83, [27] ¶¶ 56, 57.[1]  At the party, several Boeing managers approached Bonomo about possibly assuming a leadership role in another area of the company.  Doc. [22] ¶ 84.  By the time Bonomo left Boeing, his annual salary was $139,000, and he had received pay raises each year he was employed, up to and including in 2019.  *Id.* ¶¶ 90, 91.  Bonomo was unaware of any statements made by Boeing employees to the effect that they wanted him to quit, and Bonomo acknowledged that he could have continued working in the same position after January 2, 2020.  *Id.* ¶¶ 88, 89.

At the time he left Boeing and shortly thereafter, Bonomo refrained from seeking new employment, believing that he would "collect [his] Social Security and retirement and be retired."  Docs. [22] ¶ 92, [12-1] at 227:6-12.  Bonomo ultimately changed his plans when, on May 29, 2020, he again began working at Boeing in the position proposed to him at his retirement party.[2]  Doc. [22] ¶ 93.  In his new role, Bonomo worked as a contractor employed by PDS Tech, a company that supplies engineers to Boeing and other companies who need them.  Docs. [22] ¶ 93, [12-1] at 233:14-235:5.  In this new position, Bonomo makes about $102 per hour, and he expects to make up to $213,000 annually.  Doc. [22] ¶ 94.

## PROCEDURAL HISTORY[3]

On November 4, 2019, Bonomo filed his first lawsuit against Boeing in which he alleged age discrimination and retaliation for Boeing's decision to not promote him in December 2018.  *Bonomo I*, Docs. [1], [1-1].  On December 30, 2019, Boeing removed that case to this Court.  *Id.* at Doc. [1].  Discovery in that case ended on September 9, 2020, and Boeing moved for summary judgment on November 17, 2020.  *Id.* at Doc. [32].

Bonomo filed a second Charge of Discrimination with the Missouri Commission on Human Rights on May 28, 2020, nearly seven months after filing the 2019 lawsuit, Doc. [22] ¶ 98, and on February 24, 2021, Bonomo filed the instant lawsuit, Doc. [1] ¶ 1.  In his Complaint in this matter, Bonomo raises two counts:  (i) constructive discharge based on age discrimination, and (ii)

---

[1] It is not clear from Bonomo's testimony whether his retirement party was on November 22, 2019, or January 2, 2020.  Doc. [12-1] at 213:11-26, 227:25-228:2.  The discrepancy is immaterial for summary judgment purposes.

[2] Bonomo purports to dispute that he returned to Boeing on May 29, 2020.  Doc. [22] ¶ 93.  He fails to give a specific citation to the record to support his dispute, however, and so the fact is deemed admitted for the purposes of summary judgment.  *See* E.D. Mo. L.R. 4.01(E).

[3] As mentioned, the same parties are involved in a related lawsuit, which was removed to this Court before the undersigned, *Bonomo v. The Boeing Company*, Case No. 4:19-cv-03394-SEP (E.D. Mo. filed Dec. 30, 2019).  The Court takes judicial notice of that file.  *See Schlafly v. Eagle Forum*, 2017 WL 3996224, at *1 n.1 (E.D. Mo. Sept. 7, 2017).

constructive discharge based upon unlawful retaliation.  Doc. [1-3] ¶¶ 56-71.  Boeing moves for summary judgment on both counts.  Doc. [10].

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, either party may move for summary judgment. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden to "bring up the fact that the record does not contain" a genuine dispute of material fact "and to identify that part of the record which bears out his assertion." *Counts v. MK-Ferguson Co.*, 862 F.2d 1338, 1339 (8th Cir. 1988) (quoting *City of Mt. Pleasant v. Assoc. Elec. Coop.*, 838 F.2d 268, 273-74 (8th Cir. 1988)). "[I]f the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue." *Id.* "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by" either "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

## DISCUSSION

### I.     **Bonomo's MHRA claim is untimely.**

Missouri law requires that, "[a]s a jurisdictional condition precedent" to filing a lawsuit under the MHRA, "any person claiming to be aggrieved by an unlawful discriminatory practice shall make, sign and file with the [Missouri Commission on Human Rights] a verified complaint in writing, within one hundred eighty days of the alleged act of discrimination[.]" MO REV. STAT. § 213.075.1.  Failure to timely file the discrimination charge "may be raised as a complete defense by a respondent or defendant at any time, either in the administrative proceedings before the commission, or in subsequent litigation, regardless of whether the commission had issued the person" a letter indicating his or her right to sue. *Id.* "Missouri courts have clearly found the filing deadline under the MHRA to be jurisdictional and this Court is obliged to follow the substantive rulings of the Missouri courts on this issue." *Hill v. St. Louis Univ.*, 920 F. Supp. 124, 125 (E.D. Mo. 1996).

Boeing and Bonomo dispute when the clock began for Bonomo to file his charge with the Commission.  Boeing contends that in constructive discharge cases where the employee resigns, "the limitations period begins when an employee 'gives his employer definite notice of his intent to resign,'" Doc. [11] at 6 (quoting *Green v. Brennan*, 578 U.S. 547, 564 (2016)), and that Bonomo gave definitive

notice through the November 25, 2019, email to his supervisor, Daniel Oetjen. Doc. [11] at 7 (citing Doc. [22] ¶ 81). Bonomo does not dispute the applicability of *Green*'s rule; instead, he claims that there is a genuine dispute of fact over the date he gave notice, arguing that the proper date is December 2, 2019, the date he filed termination paperwork. Doc. [21] at 8. Because December 2, 2019, is within the 180-day window, Bonomo asserts he timely filed his discrimination charge.

Whether Bonomo's Charge was timely or not ultimately turns upon defining the term "alleged act of discrimination" in the constructive discharge context. *See* MO. REV. STAT. § 213.075.1. Because Missouri courts have the ultimate say on questions of Missouri law and those decisions are binding upon federal courts sitting in diversity jurisdiction, *Missouri v. Hunter*, 459 U.S. 359, 368 (1983), it is necessary to determine whether Missouri courts have interpreted that phrase with respect to constructive discharge claims. If Missouri courts have not clarified the issue, the Court must try to anticipate how the Missouri Supreme Court would decide the question. *Lenhardt v. Basic Inst. Of Tech., Inc.*, 55 F.3d 377, 379 (8th Cir. 1995) ("When a state's highest court has not addressed the precise question of state law that is at issue, a federal court must decide 'what the highest state court would probably hold were it called upon to decide the issue.'") (quoting *Hazen v. Pasley*, 768 F.2d 226, 228 (8th Cir. 1985)).

Missouri courts routinely construe the MHRA in accordance with both state law and federal antidiscrimination law. *See, e.g., Daughtery v. City of Maryland Heights*, 231 S.W.3d 814, 818 (Mo. banc 2007) (noting that Missouri courts are guided by state and federal employment discrimination law consistent with Missouri law), *overruled by* S.B. 43, 99th Leg., 1st Reg. Sess. (Mo. 2017); *Midstate Oil Co., Inc. v. Mo. Comm'n on Human Rights*, 679 S.W.2d 842, 845 (Mo. banc 1984) (construing a prior version of the MHRA as importing the federal *McDonnell-Douglas* test); *Medley v. Valentine Radford Comm., Inc.*, 173 S.W.3d 315, 319 (Mo. App. 2005) (noting that Missouri courts deciding MHRA claims "are guided by both Missouri law and any applicable federal employment discrimination decisions."); *West v. Conopco Corp.*, 974 S.W.2d 554, 556-57 (Mo. App. 1998) (utilizing federal cases when evaluating age discrimination claims under the MHRA). Bonomo offers no reason why Missouri courts would refrain from applying the *Green* rule, and that rule does not apparently conflict with the MHRA.

Applying *Green*, Bonomo was required to give notice to Boeing that he intended to resign on or after November 30, 2019, which is exactly 180 days before he filed his Charge of Discrimination on May 28, 2020. Doc. [22] ¶ 98. Boeing offers uncontroverted evidence that on November 25, 2019, Bonomo sent an email to Daniel Oetjen indicating that his intent to resign. Docs. [11] at 7, [12-17] at 2. In the email, Bonomo states that he "terminated [his] employment with Boeing as of

4

01/02/2020[,]" and that "[Oetjen] should receive paperwork that [he] will need to fill out." Doc. [12-17] at 2. Because Bonomo filed his constructive discharge charge five days after the 180-day window that began on November 25, 2019, his charge is untimely.

In his response, Bonomo mistakenly treats submitting termination paperwork as a necessary condition of giving notice. Doc. [21] at 8. In *Green*, the Supreme Court clarified that in the constructive discharge context, an employee's giving notice of his or her intent to resign triggers the filing period. *Green*, 578 U.S. at 564. "If an employee gives 'two weeks' notice"—telling his employer he intends to leave after two more weeks of employment—the limitations period begins to run on the day he tells his employer, not his last day of work." *Id.* at 564. *Green* did not say that notice is given only at the time the resigning employee submits termination papers, and the underlying Tenth Circuit decision does not suggest as much. The Tenth Circuit held that because Green's settlement agreement allowed him to continue working for the Postal Service in Wyoming, it did not give definitive notice and, instead, that Green definitively notified the Postal Service when he submitted his termination papers. *Green v. Brennan*, 669 F. App'x 951, 952 (10th Cir. 2016). Here, the uncontroverted evidence shows that on November 25, 2019, Bonomo unconditionally stated his intention to resign effective January 2, 2020. Docs. [22] ¶ 81, [12-17] at 4.

## II.     There is no evidence that Boeing intended for Bonomo to quit.

"Constructive discharge occurs when an employer deliberately renders an employee's working conditions so intolerable that the employee is forced to quit their job." *Wallingsford*, 287 S.W.3d at 686 (quoting *Gamber v. Mo. Dept. of Health & Senior Servs.*, 225 S.W.3d 470, 477 (Mo. App. 2007)). To prove an MHRA constructive discharge claim, the plaintiff must show: (1) a reasonable person in the employee's position would find the working conditions intolerable, and (2) either the employer intended the employee to quit, or the employer could reasonably foresee that its actions would cause the employee to quit. *Cosby v. Steak N Shake*, 804 F.3d 1242, 1246 (8th Cir. 2015) (quoting *Watson v. Heartland Health Labs., Inc.*, 790 F.3d 856, 863 (8th Cir. 2015)).

The uncontroverted evidence offers no indication that Boeing intended Bonomo to resign or that Boeing had any reason to foresee that Bonomo would resign. Bonomo testified that he was unaware of any Boeing employee making any statement that indicated a desire that Bonomo resign, Doc. [22] ¶ 88, and Bonomo acknowledges that he could have continued working at Boeing in his same position after January 2, 2020, *id.* ¶ 89. After Bonomo was rejected for the 2018 Level M management position, Dewees, the 2018 hiring manager, offered to give Bonomo constructive feedback about how Bonomo might interview better in the future. *Id.* ¶ 68. Bonomo continued to

5

receive raises during his tenure with Boeing and by the time he retired, he earned a $139,000 salary. *Id.* ¶¶ 90-91. At his retirement party, Boeing managers Mike Lewis and Paul Wynn approached Bonomo and suggested that Bonomo consider a new opportunity that would allow him to continue working with Boeing through PDS Tech. Docs. [22] ¶¶ 84, 93, [12-1] at 233:14-234:20, [12-1] (Exhibit MM). Bonomo eventually took the position with PDS Tech on May 29, 2020, and began receiving compensation nearly 1.5 times his Boeing salary. *Id.* ¶¶ 93-94.

Instead of offering evidence to support an inference that Boeing intended him to resign, Bonomo argues that Boeing asks the Court to draw all reasonable inferences in the movant's favor. Doc. [21] at 9-10. That is not enough to overcome summary judgment. Bonomo must point to some evidence in the record that, when viewed in a light favorable to him, generates a genuine dispute regarding Boeing's intention to "'deliberately [render his] working conditions so intolerable that [he was] forced to quit.'" *Noel v. AT & T Corp.*, 744 F.3d 920, 921 (8th Cir. 2014) (emphasis in original) (quoting *Wallingsford*, 287 S.W.3d at 686). Like the plaintiff in *Noel*, Bonomo admits that no one at Boeing told him to resign, that he was unaware of any instances where Boeing discriminated against other older employees, and that he could have continued working at Boeing after January 2, 2020. Doc. [22] ¶¶ 88, 89, 95-96; *see Noel*, 744 F.3d at 921 ("Noel admits that no one told him to resign, told him he could not return to work, or ever disparaged him in any way related to his diabetes."). The additional fact that Boeing managers recommended that Bonomo consider the PDS Tech position, which would entail working with Boeing, undermines any suggestion that Boeing wanted Bonomo to leave. Docs. [22] ¶ 93, [12-1] 233:14-234:20.

Accordingly,

**IT IS HEREBY ORDERED** that Boeing's Motion for Summary Judgment, Doc. [10], is **GRANTED**.

A separate Order of Judgment will accompany this Memorandum and Order.

Dated this 25th day of February 2022.

*Sarah E. Pitlyk*
SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE